**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES, | NO. CR 06-775 GPS |
| Plaintiff, | |
| | **ORDER DENYING DEFENDANT WEISZ'S WIRETAP MOTION;** |
| v. | |
| NAFTALI TZI WEISZ; YESHIVA IMREI YOSEF; YESHIVATH SPINKA; CENTRAL RABBINICAL SEMINARY; MACHNE SVA ROTZOHN; MESIVTA IMREI YOSEF SPINKA; YAACOV ZEIVALD; YOSEF NACHIUM NAIMAN; MOSHE LAZAR; ALAN JAY FRIEDMAN | **ORDER DENYING DEFENDANT ZEIVALD'S MOTIONS TO SUPPRESS EVIDENCE AND STATEMENTS;** |
| | **ORDER GRANTING DEFENDANT WEISZ's AND DEFENDANT YESHIVA IMREI YOSEF'S MOTION TO SUPPRESS EVIDENCE FROM STORAGE CLOSET;** |
| Defendants. | **ORDER DENYING MOTIONS FOR BILL OF PARTICULARS FOR DEFENDANT ZEIVALD AND DEFENDANT NAIMAN** |

On June 16, 2008, the following motions were filed:

* Defendant Naftali Tzi Weisz manually filed a Motion to Suppress Evidence relating to a wiretap investigation (hereinafter "Wiretap Motion").[1]

* Weisz also filed another Motion to Suppress All Items Seized from a Storage Closet at 1466 56th Street, Brooklyn, New York. (hereinafter "Storage Closet Motion 1");

---

[1] The following Defendants joined in this motion: Alan Jay Friedman, Moshe Lazar, Yaacov Zeivald, Yosef Nachium Naiman, Yeshiva Imrei Yosef, Yeshivath Spinka, Central Rabbinical Seminary, Machne Sva Rotzohn, and Mesivta Imrei Yosef Spinka.

| | |
|---|---|
| 1 | * Defendants Yeshiva Imrei Yosef, Yeshivath Spinka, Central Rabbinical Seminary, |
| 2 | Machne Sva Rotzohn, and Mesivta Imrei Yosef Spinka (hereinafter the "Spinka |
| 3 | Defendants") filed a Motion to Suppress All Items Seized from a Storage Closet at |
| 4 | 1466 56th Street, Brooklyn, New York ("Storage Closet Motion 2")[2] ; |
| 5 | * Defendant Yaacov Zeivald filed a (1) Motion to Suppress Evidence ("Zeivald Motion |
| 6 | to Suppress Evidence"), (2) Motion to Suppress Statements ("Zeivald Motion to |
| 7 | Suppress Statements"), and (3) a Motion for Bill of Particulars ("Zeivald Motion for |
| 8 | Bill of Particulars"); and |
| 9 | * Defendant Yosef Nachum Naiman filed a Motion for a Bill of Particulars ("Naiman |
| 10 | Motion for Bill of Particulars"). |

11  The Court heard argument on these motions. Additionally, the Court held an evidentiary hearing
12  on Zeivald's Motions to Suppress Statements and Evidence. For the reasons below, the Court
13  **DENIES** Defendant Weisz's Wiretap Motion and Defendant Zeivald's Motions to Suppress
14  Statements and Evidence, but **GRANTS** Defendant Weisz's and Defendant Yeshiva Imrei Yosef'
15  s Storage Closet Motion .[3] Thus, evidence resulting from the unconstitutional search of the
16  Storage Closet shall be suppressed for Defendant Weisz and Defendant Yosef. Additionally, the
17  Court **DENIES** both Defendant Zeivald and Naiman's Motions for Bill of Particulars.

18

19  I.  **DISCUSSION**

20  This case involves allegations of tax fraud and money laundering allegedly committed
21  through a religious group within Orthodox Judaism**,** referred to as Spinka**.** The alleged scheme
22  was purportedly carried out as follow: First, a party would donate a significant amount of money,
23  $100,000.00 for example, to Spinka. In return, Spinka would give the party a receipt for their
24  "$100,000.00 donation" to use for tax write-off purposes. Instead of keeping this donation in its

25

26  _____

27  [2]  Defendant Naftali Tzi Weisz joined in this motion.

28  [3]  The Court **DENIES** this Motion as to the other Spinka Defendants for lack of standing. *See* discussion, *infra.*

entirety, however, Spinka would channel the $100,000.00 through extraterritorial accounts, principally maintained in Israel. Through these accounts, it is alleged that often up to 80-85% of the "donation" would be "laundered" and returned to the donor, who would, nevertheless show the full "donation" on his/her tax returns. Spinka would retain the balance of the "donation." Under this scheme, Spinka allegedly received donations, and the donors benefitted by offsetting taxes by false donations. This scheme allegedly continued for years, causing the United States to lose hundreds of millions in tax revenue. For the sake of brevity, further factual details will be incorporated into the analysis of each motion.

### A. Defendant Weisz's Wiretap Motion

As shown below, the United States Attorney's Office of the Central District of California (the "Government") carried its burden of showing the wiretap's necessity. Moreover, Defendant's alternative arguments that the search warrant affidavit (1) did not set forth the enumerated offenses required for the wiretap or (2) required a *Franks* hearing also fail.[4]

#### 1. Factual Background

The government began investigating the money-laundering conspiracy involving Spinka in October 2004 because an informant, R.K., apparently trying to improve his position regarding allegations of health care fraud, reported that he had participated in the Spinka scheme by making large contributions through Defendant Moshe Zigelman, the assistant to Defendant Weisz. Weisz "was the Grand Rabbi, or spiritual leader, of Spinka and an agent of Spinka." (Second Superseding Indictment ¶ 7.) R.K. informed the government that Zigelman, through other unknown entities, would use couriers and international wire transfers to return large portions of R.K.'s donations to Spinka but still mail receipts to R.K. in the full donation amount. Then, R.K. would file his income tax returns, claiming the full amount of charitable donations without accounting for the portions that had been returned to him.

---

[4] *Franks* refers to *Franks v. Delaware*, 438 U.S. 154, 171-72 (1978), which calls for a court to hold an evidentiary hearing if a defendant can show that (1) the search warrant affiant deliberately submitted a falsehood in the affidavit or submitted information with a reckless disregard for the truth and (2) the affidavit lacks probable cause if purged of these falsehoods.

On October 12, 2006, the grand jury indicted Zigelman on three counts. The indictment charged him with conspiracy and assisting in the preparation of false tax returns, *inter alia*. To determine the scope of the conspiracy and identify all of its participants, the government obtained wiretap orders over two telephones associated with Defendant Zigelman. On December 15, 2006, U.S. District Judge Howard Matz authorized wiretaps for thirty days over a cellular phone used by Defendant Zigelman and a land-line telephone, which was believed to be used by Zigelman. The wiretap application was supported by an affidavit from Special Agent Chris O'Dowd from the Federal Bureau of Investigation ("FBI"). U.S. District Judge Dean Pregerson subsequently authorized a renewal of these wiretaps for another thirty days.

2.     Legal Standard

Wiretap authorizations are governed by the Omnibus Crime Control and Safe Streets Act ... ." *United States v. Rivera*, 527 F.3d 891, 897 (9th Cir. 2008) (citing 18 U.S.C. §§ 2510-2522). "'To obtain a wiretap, the government must overcome the statutory presumption against the intrusive investigative method by proving necessity.'" *Rivera*, 527 F.3d at 897 (quoting *United States v. Gonzalez, Inc.*, 412 F.3d 1102, 1112 (9th Cir. 2005)). The necessity requirements are found in sections 2518(1)(c) and 2518 (3)(c). For example, section 2518(3)(c) states, in relevant part, that a judge may approve a wiretap if he or she determines on the basis of the facts submitted by the applicant that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." The procedural steps provided for in the Act require strict adherence and utmost scrutiny to determine whether wiretap orders conform to the Omnibus Crime Control and Safe Streets Act. *United States v. Blackmon*, 273 F.3d 1204, 1207 (9th Cir. 2001).

The necessity requirement, however, "should not be interpreted to require law enforcement to exhaust every possible technique before resorting wiretapping, but to ensure that in the usual case wiretapping is not used as the first meaningful step in an investigation." *United States v. Gonzalez, Inc.*, 412 F.3d 1102, 1113 (9th Cir. 2005) (citation omitted). Rather, the Ninth Circuit uses a standard of reasonableness to determine whether the government's good faith effort to use alternative investigative means or its failure to do so because of danger or low probability of

success.  *United States v. Fernandez*, 388 F.3d 1199, 1236 (9th Cir. 2004)  (quoting *United States v. Canales Gomez*, 358 F.3d 1221, 1225-26 (9th Cir. 2004)).  Ultimately, a judge's conclusion that a wiretap was necessary is subject to review for abuse of discretion.  *Id.* at 1237; *see also United States v. McGuire*, 307 F.3d 1192, 1197 (9th Cir 2002) (explaining that the court issuing a wiretap has considerable discretion in finding whether the necessity requirement has been satisfied, making the standard of review deferential).

>    3.    Analysis

Defendant Weisz argued that the Government *should have* used R.K. as an informant to investigate Weisz rather than seek and obtain a wiretap.  While the Court agrees that this would be a less intrusive procedure than a wiretap, the Government asserts forth solid reasons why it would be unlikely to succeed in its investigation if it were to rely on R.K. as an informant.  (See affidavit for Wiretap Application, Ex. 2 of  Decl. of Moez Kaba in Support of Def.'s Wiretap Motion ("Wiretap Affidavit"), ¶¶ 161-167.)

For example, the Court finds reasonable the affidavit's assertion that R.K., as a contributor to Spinka himself, was "not in a position to provide information as to similar activity undertaken by other contributors who are not connected to his own activity." (*Id.* ¶ 164.) Moreover, even when R.K. did inquire about the source of the cash payment/wire transfers in regards to his own activity, the proofs of the transfers were redacted. (*Id.* ¶ 165.) These arguments made it reasonable for the Court to consider and reject this particular alternative investigative tool.  *See, e.g., United States v. Shyrock,* 342 F.3d 948, 976 (9th Cir. 2003) (finding reasonable the judge's conclusion that necessity was satisfied because several informants could not possibly reveal the full nature and extent of the Mexican Mafia's enterprise and its countless, and at times disjointed, criminal tentacles under investigation).

Defendant Weisz also argued that other investigative techniques would have been successful in this case such as: (1)  interviews and grand jury subpoenas; (2) physical surveillance; (3) toll records, pen registers and traces; (4) mail covers; and (5) search warrants. Again, the Government's affidavit for a wiretap sets forth specific facts showing why these other investigative techniques either failed or would not succeed.  (Wiretap Affidavit ¶¶ 155-182.)  For

example, as for the interviews and grand jury subpoenas, the affidavit notes that the Eastern District of New York attempted to interview a number of contributors, even immunize one individual, but none agreed to cooperate. (*Id.* ¶ 159.)  Judge Matz reviewed these alternative techniques and determined they were either (1) attempted and failed or (2) considered unlikely to succeed by the government.  Judge Matz did not abuse his discretion when he found necessity from the facts stated within the affidavit and approved the wiretap order at issue.

### 4.  Alternative Arguments

Defendant Weisz's alternative arguments also fail.

#### a.  Enumerated Offenses

Because 18 U.S.C. § 2516 (1)  limits the scope of the wiretap to investigate the enumerated offenses only  (such as conspiracy money laundering, wire fraud, and mail fraud), Defendant Weisz also claimed the wiretap order was deficient because the Government sought to prosecute tax fraud and money remitting, which are not enumerated offenses.  The government's 92-page affidavit, however, deflates this argument.  The affidavit clearly set forth the issues of conspiracy, mail fraud, wire fraud and money laundering, and these offenses are enumerated in section 2516, particularly conspiracy, mail fraud, wire fraud, and money laundering.[5]

#### b.  Franks Hearing

Defendant Weisz also argued that he was entitled to a *Franks* hearing because the Government's affidavit seeking the wiretap contained alleged misstatements.  Yet, even if the affidavit did have misstatements, Defendant Weisz failed to meet the standard required to invoke a *Franks*  hearing.   *See United States v. Perdomo*, 800 F.2d 916, 920-21 (9th Cir.  1986).  Ultimately, Defendant Weisz did not show that the government intentionally or recklessly submitted

---

[5]   Defendants also asserted the wiretap was improper because the fact that a sealed indictment had been procured was not disclosed to the Court. Defendant failed to support this premise with authority, either in the papers or at argument, and the Court finds no reason to believe that the information would have resulted in a different result or that the sealed indictment automatically precluded the ongoing wiretap. Moreover, even if this information would have had a *per se* impact on the wiretap, Defendant has not met the burden to invalidate it. See, *infra.*

any allegedly false information or failed to include the pertinent information or that, if the affidavit were altered, the affidavit would lack probable cause and change the decisions of Judge Matz and Judge Pregerson approving the wiretapping of Zigelman's telephones.

### 5. Conclusion

In light of the analysis above, the Court **DENIES** Defendant Weisz's motion to suppress evidence generated from the government's wiretap.

## B. Defendant Weisz's Storage Closet Motion

In contrast, Defendant Weisz succeeded in demonstrating the Government violated his constitutional rights in the search of the storage closet in the conference room at the 1466 56th Street, Brooklyn, New York address and seizure of documents from that closet. Thus, the Court **GRANTS** his motion to suppress this evidence. The Court also **GRANTS** this motion for Defendant Yeshiva Imrei Yosef, the only other Spinka Defendant with standing to raise the issue here.

### 1. Factual Background

On December 19, 2007, a team of federal agents from the FBI and Internal Revenue Service ("IRS") executed a search warrant on the office of Defendant Weisz located at 1462 56th Street, Brooklyn, New York. The office was inside his apartment attached to the Yeshiva conference room at 1466 56th Street. A set of double doors linked the conference room to Weisz's office in his apartment. After reviewing an affidavit by Special Agent Patrick Baldree, the magistrate judge approved the search of the office, and the warrant expressly permitted agents to go through the conference room to obtain access to Weisz's.

At approximately 9:00 a.m., agents entered the building to search for help from other employees in the Yeshiva building to create a peaceful entrance, rather than a forcible entry. They could not get help, despite their asking an instructor in the building as well as the Rabbi's daughter. The instructor told them the Rabbi was on vacation and that they should go to the

apartment and ask his family to help them enter. (Pl.'s Opp'n to Defs.' Storage Closet Motions 1&2 4:23-26.) The Rabbi's daughter did not answer the agents request and, instead, returned to the household and failed to return promptly. (*Id.* 5:10-17.)

The agents then formed a breach team to forcibly enter the conference room. Allegedly, the breach team entered the conference room and, as part of a "protective sweep," opened the storage closet doors. (*Id.* 5:18-6:22.) The doors to the closet were closed when the agents entered. The agents opened the closet doors and left them open for the duration of the search. The agents then came through the conference room to enter and search the Rabbi's office in the adjoining apartment. Agent Joseph Moriarty asserted he noticed what appeared to be incriminating documents in the closet on the way through the conference room but did not search it because the conference room and closet were not included as areas subject to search in the warrant.

Throughout the search, agents would return to the conference room to wait for the others to finish. Approximately an hour and forty minutes later, at the end of the search, several agents noticed what appeared to be financial documents and boxes in the storage closet. (*Id.* 9:7-22.) Accordingly, they called the Central District of California and then, after getting guidance, seized the documents and applied for a further search warrant, which was granted later that day.

2.    Analysis

Defendant Weisz and the Spinka Defendants generally argued that the evidence seized from the storage closet should be suppressed because (1) the government did not have a warrant to search the closet; (2) the government fails to meet the requirements for the plain view exception to a warrantless search; and (3) the search of the evidence seized from the storage closet cannot be saved because the second warrant was invalid (i.e., the fruit of a poisonous tree). In its opposition, the government argues that only Defendant Yeshiva Imrei Yosef, who owns and operates his business on the property, has standing to assert Fourth Amendment protections over the items in the storage closet.

As the analysis below shows, the Court finds that Defendants Yosef and Weisz have standing and that the government failed to prove the first element of the plain view doctrine (i.e., that law enforcement officials were lawfully in the place where the seized items were in plain view).

                                    *a.*   *Standing*

Aside from Defendant Yosef who has standing because he owns the conference room, Defendant Weisz and the other Spinka Defendants claim that they can assert Fourth Amendment violations with regard to the evidence seized from the storage closet.

To establish standing to challenge the legality of a search or seizure, defendants must demonstrate they had a legitimate expectation of privacy in the storage closet. *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980); *United States v. Sarkisian*, 197 F.3d 966, 986 (9th Cir. 1999). "To demonstrate this, the defendants must manifest a subjective expectation of privacy in the area searched, and their expectation must be one that society would recognize as objectively reasonable." *Sarkisian,* 197 F.3d at 968. While a person cannot possess a reasonable expectation of privacy in an item in which he has no possessory or ownership interest, the Ninth Circuit does not narrowly define this interest. *United States v. Thomas*, 447 F.3d 1191, 1197 (9th Cir. 2006). If a party can show joint control or common authority over the property searched, he may have standing. *Id.* at 1198. "Common authority rests 'on mutual use of the property by persons generally having joint access or control for most purposes.'" *Id.* (quoting *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990)). Defendant Weisz claims he is authorized to use – and does use – the conference room as his work room. (Def. Weisz' Reply 4:3-6.) Weisz keeps keys to all the doors leading to the conference room. He uses the room to meet with congregants, lecture students and conduct his official duties. He also "stores his personal items in the Closet and excludes the public from access to the closet." (*Id.* 4:9-11; *see also* Weisz Decl., Ex. 1 of Decl. of Moez Kaba in Support of Weisz' Reply.)

In reviewing the totality of the circumstances, the Court finds Defendant Weisz has shown that he had a legitimate expectation of privacy in the storage closet. *See Sarkisian*, 197 F.3d at 968. But the other Spinka Defendants, aside from Defendant Yosef, fail to show both a subjective and objective use of, access to, or control over the conference room and/or storage closet.

*b.     Plain View Doctrine*

"It is well established that under certain circumstances the police may seize evidence in plain view without a warrant." *Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971). "To satisfy the plain view doctrine: (1) the officer must be lawfully in the place where the seized item was in plain view; (2) the item's incriminating nature was 'immediately apparent;' and (3) the officer had 'a lawful right of access to the object itself.'" *United States v. Wong*, 334 F.3d 831, 838 (9th Cir. 2003) (citation omitted).

In applying this test, the Court finds that the government fails to meet the first prong of the plain view doctrine.  The law enforcement officials searching the office were *not lawfully* in front of  the storage closet *with its opened doors* where the seized items were in plain view.  While the agents were legally allowed by the warrant to use the conference room to access Rabbi Weisz's office, their reliance upon the concept of a  "protective sweep" to justify the opening of the closet doors and maintaining them in an open position throughout the search is constitutionally infirm an fails to satisfy the constitutional framework required by *Maryland v. Buie,*  494 U.S. 325  (1990). Therefore, the legal justification for opening the storage closet doors, which was the only way the law enforcement officials could see the items inside, fails.  In other words, the law enforcement officials could legally walk past the closed storage closet but could not legally pry open the doors *under the circumstances here*.

*In Buie,* a protective sweep is defined as a "quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others."  *Id.* at 327 ( "It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding.")    A protective sweep, incident to arresting the individual in a home, is valid if the searching officer possessed a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warranted the officer in believing that the area swept harbored an individual posing a danger to the officer or others.  *Id.* However, it must always be borne in mind that a protective sweep is an *exception* to the normal constitutional requirement of a search warrant.  This Court concludes that if the requirements of that exception are too broadly construed, they have the potential to undermine the Fourth

Amendment protections established by the framers of the Constitution and the consistent line of constitutional jurisprudence since that time.

Here, the protective sweep was not incident to an arrest, but rather a search warrant. The Ninth Circuit has not clearly addressed whether an officer can do a protective sweep incident to a search warrant. Relying on First Circuit authority, a sister court in the Central District of California reasoned that "the policy underlying the central holding of *Buie* – the safety of the officers executing the warrant – is equally applicable to the execution of a search warrant."). *See Meredith v. Erath*, 182 F. Supp.2d 964, 977 (C.D. Cal. 2001) (citing *Drohnan v. Vaughn*, 176 F.3d 17, 22 (1st Cir. 1999)) rev'd in part on other grounds, 342 F.3d 1057 (9th Cir. 2003). Without governing precedent, the Court agrees with its sister court in *Erath* and finds the policy underlying *Buie* applies here. However, the Court agrees with the defense that the execution of a search warrant does not have the same potential for violence as does the execution of an arrest warrant, and, therefore, the requirement of a protective sweep must be even more narrowly applied. In other words, because the search/seizure of the storage closet items were incident to a search warrant of the office next door to a commercial building, the Court finds the *Buie* standard should be applied more stringently.

Thus, after applying *Buie* to these particular circumstances, the Court finds the government has failed to show the law enforcement officials searching Rabbi Weisz's office had a reasonable belief, based on *specific and articulable facts and rational inferences drawn from those facts*, that the conference room harbored any danger to the agents or others.

First, it is conceded the documents considered by agents prior to the execution of the warrant indicated there was no expectation of violence or other danger. The subsequent so-called refusal by Yeshiva personnel and the Rabbi's daughter to let the law enforcement officials enter peacefully does not equate to a reasonable belief of danger. The refusal was not violent or antagonistic. To the contrary, the Yeshiva instructor appeared to help the law enforcement officials, telling them that they could go to the front door of the Rabbi's house and enter in that way with the help of the Rabbi's family. (Pl.'s Opp'n to the Storage Closet Motions 1&2, Berry Decl. ¶ 5.) While it is true the Rabbi's daughter was silent and walked back into the house after the

agents made their request, this fact does not infer the daughter posed a danger. Granted, if the government had specifically shown the daughter was armed or dangerous in some other way, the Court might see the situation differently. But this was not the case–there was no showing that she posed any danger to anyone.

Additionally, the Court finds the government's reference to the alleged danger stemming from one public commotion in the local Hasidic community where police officers were assaulted did not provide the kind of specific articulable threat required here to undertake the protective sweep. Agent Chris O'Dowd testified that he heard of a riot in 2006, approximately a year before the search at issue. Moreover, he failed to show the 2006 "riot" was close to the Yeshiva conference room or even *connected to Spinka followers in any way.*

O'Dowd helped plan the search. If he was wary of specific danger from the Spinka congregants, it was not apparent from the search plan. In fact, as indicated, *supra*, the law enforcement officials who actually prepared a Search and Arrest Plan of the conference room and the Rabbi's office did not expect danger. The Plan specifically stated "No indication of Violence" in the Caution Statement. (Ex. 1, Decl. Brian Hennigan, Defendant Weisz' July 17, 2008 Ex Parte Application.) Moreover, the plan states that neither Weisz nor Zigelman – the two target suspects – would be present when the search warrant was being executed.

In light of this contradiction, the main reason for the protective sweep boils down to the custom and practice of the FBI. (*See, e.g.*, Pl.'s Opp'n to the Storage Closet Motions 1&2, Bryceland Decl. ¶ 7: "It is customary practice to open any closed doors or concealed spaces that are large enough to hide a person." ) While the Court understands the motive for the custom and practice and is mindful of the needs of officers to protect themselves from danger, the custom and practice cannot override settled constitutional protections embodied in the general necessity of obtaining a search warrant. Under *Buie,* law enforcement custom and practice is not enough. *See, e.g., United States v. Hauk,* 412 F.3d 1179, 1186-88 (10th Cir. 2005) (suggesting that a routine protective sweep would presumably be inappropriate if conducted by officers serving a warrant for a traffic ticket or securities fraud).

In *Hauk,* the Tenth Circuit noted that district courts must give "due weight" to police officers in allowing their experience and training to make inferences that could elude an untrained person. *Id.* at 1188. "Where, however, there is reason to believe that the officers conducted the search not on the basis of the particular facts of the case but on some other grounds, such as standard operating procedure, the inference that the judgment reflected their superior training and experience is correspondingly weakened, and the 'due' weight given their judgment is correspondingly less." *Id.* Thus, this weakens any reasonable belief that the law enforcement officials may have had about dangerous individuals in the conference room.

Moreover, the law enforcement officials did not appear to equally enforce this custom and practice. Rather than open all the doors that may posed a danger in their "protective sweep", they actually put a chair in front of the door from Rabbi Weisz's office to his home. It would certainly appear as likely or even more likely that a threat to agent safety would come from another area of the house than the closet in the conference room. Yet, agents did not check for potentially dangerous individuals that could pose a threat behind the door. Rather, at oral argument, they explained that they chose to block the door with a chair. This inconsistency further weakens their argument that they had articulable facts warranting a belief that anybody posed a danger there.

As the record shows, the particular facts of this case do not meet *Buie's* requirement for conducting a protective sweep. The case at hand is a white-collar financial crime with no hint of drugs, violence, gang affiliations, or specific facts that would make any reasonably prudent officer believe that he or she faced danger in searching that specific conference room. *Compare U S v. King*, 222 F.3d 1280, 1284-85 (10th Cir. 2000 ) (affirming a protective sweep during a search warrant because the suspect had an outstanding arrest warrant for failure to appear at a felony conviction involving weapons, drugs had been purchased at the suspect's home by an informant, and the suspect had threatened an informant with a gun in the past).

Accordingly, the Court finds this first prong of the plain view doctrine dispositive and **GRANTS** Defendant Weisz's and Defendant Yosef's motion to suppress all items seized from the

storage closet of the conference room at 1466 56th Street, Brooklyn, New York.[6]  The motion is **DENIED** as to the other Spinka Defendants due to lack of standing.

### C.    Defendant Zeivald's Motion to Suppress Evidence and Statements

Defendant Zeivald argued for suppression of all evidence seized from his apartment and car as well as statements he made during an in-custody interview.   He alleged that law enforcement officials violated both his Fourth and Fifth Amendment rights.   The Court disagrees and **DENIES** both motions.

####     1.    Factual Background[7]

As part of this Spinka scheme, Defendant Zeivald allegedly "assisted the Spinka underground money transfer network by delivering cash from one member of the network to another." (Pl.'s Opp'n to Zeivald's Motions 2:25-27.)   In particular, the government "recorded Zeivald's illegal delivery of $80,776 in cash to R.K., a government informant, on July 23, 2007." (*Id.* 3:1-4.)   On December 18, 2007, the Court issued a warrant for Zeivald's arrest based on the grand jury's indictment of him on conspiracy, wire fraud and other related charges.   The next morning, at 6 a.m., agents from the IRS  went to arrest him at an apartment complex where they thought he resided.   He was not at the complex, but "his English speaking wife was." (*Id.* 5:16-17.)   His wife explained they were separated and gave the agents his cellular phone number. At this time, IRS Special Agent Chris Flacker ("Flacker") called the number and "proceeded to have a fluid telephone conversation, *the entirety of which occurred in English*." (*Id.* 5:23-25.) (Emphasis in original.)

As a result of this conversation, Zeivald told agents *in English* that he was at a hotel room on Ventura Boulevard. The agents went to the hotel and obtained a key to Zeivald's room,

---

[6]    Because the Court concludes the protective sweep had insufficient foundation, it need not reach the Government's argument the documents were within the "plain view" exception to the warrant requirement because, had the doors to the conference room closet remained closed, the documents could not have been seen by agents.

[7]    The facts are taken from the government's factual background.  While Defendant Zeivald disputed this factual scenario, the Court held an evidentiary hearing and found the government's factual rendition of Defendant's arrest credible.

because the manager had told agents he was in the room.  (*Id.* at 6:13-15.)   After the agents knocked and announced their presence, there was no answer.  The agents then used the key to enter the room and conduct a protective sweep.   During this sweep, Defendant Zeivald drove up in his car in the parking lot.  Law enforcement officials surrounded the car.  An officer then told Zeivald, *in English*, to exit his car slowly with his hands on his head.  Zeivald complied.  Outside his car, agent Flacker handcuffed him and placed him under arrest.  All agents/officers then "holstered their handguns" and did not take them out of their holsters after his arrest.  (*Id.* 6:27-7:4.)

The officers then moved him to his open hotel room, which contained two rooms and a bathroom.  At 6:35 a.m., Special Agent Anthony Ruckstuhl ("Ruckstuhl") read to Zeivald his in-custody statement of rights *in English.  In English*, Rucksthul asked Zeivald if he understood those rights and Zeivald answered that he did, *in English.*  (*Id.* 7:13-17, emphasis added.)   Then, Rucksthul read to Zeivald, in English, a notification of his consular rights from an email and asked him if he would like the Israeli Consulate contacted.  Zeivald said "no."  (*Id.* 7:18-22.)

Special Agent Flacker then gave Zeivald an explanation of his  in-custody rights and consent to interview via a form written in Yiddish.  Before he handed this form to Zeivald, Flacker signed and dated it on what he thought was the upper left hand corner of the document.  Because the document was in Yiddish, Flacker did not realize he had signed the document upside down.  Once Zeivald got the document, he turned it "right-side up" (*Id.* 8:16-18.)  "After reading the form, defendant stated, in English, that he understood it" and then signed and dated it.  (*Id.* 8:18-22.)  After signing the "consent form", the agents then asked him if he was willing to talk and Zeivald said he was.

Throughout the 30-minute  interview, there was "at most six IRS agents present at any one time."  (*Id.* 9:6-11.)   The interview was entirely in English and understandable by Zeivald, according to all agents present.   Plaintiff acknowledged that Zeivald said his English was limited, but claim that he never asked for an interpreter.  (*Id.* 10:27-28.)  "[N]o agent thought a translator was necessary given defendant's ready comprehension and use of English."  (*Id.* 11:3-5.)

At approximately 6:52 a.m., Flacker asked Zeivald for his consent to search the hotel room, explaining that he does not have to give permission. In response, Zeivald explained that he had nothing to hide. Flacker also asked for consent to search Zeivald's car. In reply, Zeivald said "not a problem." (*Id.* 11:16-18.) The agents then gave Zeivald a form seeking consent to search and seize items that may be related to the investigation. Zeivald read it, signed it and dated it. While Defendant Zeivald claims that an agent told him that they would get permission from a judge to search his room if he did not consent, the government contests this claim. (*Id.* 11:25-28.) After consenting to the search, however, Zeivald told the agents they could not take his cell phone. The agents complied with this limitation.

During the search, the agents found Zeivald's personal calendar and a handwritten document listing various financial transactions, which allegedly detail Zeivald's involvement in the illegal Spinka operation. (*Id.* 12:19-23.) Additionally, there were English language documents, which allegedly contained Zeivald's handwritten notes – in English.

In his reply, Zeivald contests the facts as presented by the government. He also contests many details as to the interactions and conversations with agents and officers that Zeivald had that morning on December 19, 2007, all of which seek to support that Zeivald could not read, write or understand English. (See Reply 3:21-8-9.) Because of the disputed facts, the Court held an evidentiary hearing to address the credibility of the witnesses and defendant.

2.   Analysis

The Court finds that the government prevailed in showing Defendant's understanding of English and the U.S. criminal justice system was more than sufficient to pass constitutional muster under both the Fourth and Fifth Amendment.

*a. Consent to Search Voluntary Under Fourth Amendment*

The Court must consider the following factors to assess whether consent to search was voluntarily given: (1) whether the person was in custody; (2) whether the officers had their guns drawn; (3) whether *Miranda* warnings were given; (4) whether the person was told that he had a right not to consent; and (5) whether the person was told that a search warrant could be obtained. *United States v. Soriano*, 361 F.3d 494, 502 (9th Cir. 2003) (citing *United States v. Reid*, 226 F.3d

16

1020, 1026 (9th Cir. 2000) – hereinafter the "*Reid* factors) (as amended March 11, 2004). Not one factor is determinative. *Id.* Courts finding consent voluntary typically find that several of the above factors support their conclusion. *See id.* at 1027. "Whether consent was voluntarily given 'is to be determined from the totality of all the circumstances.'" *United States v. Reid*, 226 F.3d 1020, 1026 (9th Cir. 2000) (citation omitted).

The above factors weigh in favor of finding consent voluntary in this case. First, guns were not drawn when the law enforcement officials asked for consent. Second, law enforcement officials advised Defendant he had a right not to consent. Third, law enforcement officials gave him a *Miranda* warning, which the Court finds that Defendant Zeivald understood, as further addressed below under the *Garibay* factors. *See* discussion *infra.*[8] Fourth, the parties had a factual dispute as to whether Agent Flacker informed Defendant Zeivald that, if Zeivald did not consent, Flacker would get permission from a judge to do so. At the hearing addressing this particular factual dispute, the Court found the agents more credible than Defendant Zeivald. Furthermore, the fact that Zeivald offered this detailed information to his defense counsel, unprovoked, supports his ability to understand in English. Thus, the only factor squarely on Defendant Zeivald's side is the fact that he was in custody. This alone is not enough. *See United States v. Watson*, 423 U.S. 411, 424 (1976) (noting that "custody alone has never been enough in itself to demonstrate a coerced confession or consent to search").

Accordingly, under the totality of circumstances, the Court finds consent voluntarily under the Fourth Amendment. The Court **DENIES** Zeivald's Motion to Suppress Evidence.

> b.    *Consent to Waive Fifth Amendment Rights was Voluntarily and Knowingly Given*

In *Schneckloth v. Bustamonte*, the Supreme Court noted that there is a significant difference between Fifth Amendment rights and the rights guaranteed under the Fourth

---

[8]

    Defendant Zeivald contends that the *Garibay* factors equally apply under the Fourth and Fifth Amendments as set forth in *United States v. Amano*, 229 F.3d 801, 804-05 (9th Cir. 2000). He is correct in that *Amano* finds that *Garibay* applies as to whether a foreign national *voluntarily* consented. Yet, *Amano* does not stand for the requirement that a defendant *knowingly* consent to a search under the Fourth Amendment, which is governed by *Schneckloth* as addressed below.

Amendment. 412 U.S. 218, 241 (1973). "Nothing, either in the purposes behind requiring a 'knowing' and 'intelligent' waiver of trial rights, or in the practical application of such a requirement suggests that it ought to be extended to the constitutional guarantee against unreasonable searches and seizures." *Id.* Indeed, waiving the right to protect against self incrimination carries a heavier burden. This is true especially when an individual in a foreign national and speaks another language.

To test whether a defendant knowingly and intelligently waived his *Miranda* rights, the courts look to whether the party had any language difficulties during custodial interrogation, and if so, what, if any effect they had on any alleged waiver of rights. *United States v. Garibay*, 143 F.3d 534, 537 (9th Cir. 1998) (citing *United States v. Heredia-Fernandez,* 756 F.2d 1412, 1415 (9th Cir. 1985) (explaining that language difficulties may impair the ability of a person in custody to waive these rights in a free and aware manner). Additionally, a defendant's mental capacity directly bears upon the question whether he understood the meaning of his *Miranda* rights and the significance or waiving his constitutional rights. *Id.* at 537-38. Other circumstances to consider when analyzing *Miranda* waiver as applied to a foreign national include: "(1) whether the defendant signed a written waiver; (2) whether the defendant was advised of his rights in his native tongue; (3) whether the defendant appears to understand his rights; (4) whether a defendant had the assistance of a translator; (5) whether the defendant's rights were individually and repeatedly explained to him; and (6) whether the defendant had prior experience with the criminal justice system." *Id.* (internal citations omitted); *United States v. Amano*, 229 F.3d 801, 805 (9th Cir. 2000)[9]. It is the government's burden to show that consent was voluntary by a preponderance of the evidence. *Heredia-Fernandez,* 756 F.2d at 1415.

---

[9] At argument and during the evidentiary hearing, it appeared that defense counsel contended that, under *Garibay,* the mere fact that a defendant does not speak English as a primary language or has some difficulty speaking English and communicates that to law enforcement *requires* law enforcement to cease speaking to the accused absent a translator or interpreter. The Court does not agree that the holding in *Garibay* is so broad. A claim of lack of facility in English is easily made in a society comprised of many diverse ethnic and religious groups. *Garibay* and other cases do not proclaim a *per se* rule. Rather, as indicated, *supra*, they require the evaluation of the facts specific to the situation in making determinations of understanding and whether waivers of rights are knowingly and voluntarily made.

The Court finds that Defendant Zeivald did not have difficulties with English during the custodial interview, at least according to the facts presented in the filings and at the hearing. While Zeivald told the law enforcement officials his English was limited, he spoke with them in English throughout, followed directions and even casually spoke with them in English. All law enforcement officials at the scene said that Zeivald understood English.

The most telling evidence for the Government was the testimony of Brenda Helfing. The Defendant went through a difficult and apparently acrimonious break-up of the relationship. As a result, there were limitations upon Defendant's right to meet with and speak to his children. All of his visits with the children were monitored by Ms. Helfing, then employed by the Children's Bureau. She worked for the Bureau for four or five years. To summarize extensive testimony, it appears that all communications by the parent, i.e., Defendant, had to be in language the monitor understood–here, English. Ms. Helfing communicated with Defendant extensively during numerous visits. Their communications were *in English.* She also heard Defendant talk with the children over the years *in English.* She concluded his English was "fine."

One can only assume that if Defendant's skills in understanding English were as deficient as he now asserts, he would have had an interpreter for conversations involving his children, who are clearly important to him. Indeed, had there been a mis-communication, Defendant faced the drastic possibility that his visits could be curtailed or eliminated. Thus, it strains credulity to the limit to believe that he would handle the affairs of his children so cavalierly as to speak in a language of which he comprehended very little.

Moreover, because of disputes relating to the family law issues, the Defendant was subject to certain court orders regarding his proximity to his ex-wife. Incidents occurred in relation to these orders requiring police intervention. There is nothing to suggest that these contacts with law enforcement were not conducted in English or that there was any language barrier. In that vein, there was evidence that Defendant appeared in court on occasion without an interpreter and handled matters in clerk's office on his own and without a translation. While the defense suggests that some of these appearances did not require a knowledge of English, such as paying a fine,

clearly some did require that knowledge and even reporting to the court to pay a fine requires some facility with English.

All of this evidence, coupled with the evidence from the officers and agents at the scene convince the Court that the Defendant understood his rights and knowingly consented to the search. To be sure, Defendant presented evidence that he had trouble with English, but much of this evidence either occurred under circumstances where it would be expected that he would communicate in Hebrew or Yiddish, e.g., at the Temple or with fellow adherents, or was anecdotal. For example, the testimony of Mr. Rosen about helping Defendant with hospital bills did not make clear whether any alleged failure of Defendant to understand was due to a language difficulty or a lack of understanding of his insurance coverage. The latter area is, of course, a source of confusion to many people totally fluent in English. In any event, the Court concludes the testimony on behalf of the Government was credible on the issue of the breadth of Defendant's comprehension of English while the defense testimony was not.

Additionally, nothing presented in the papers or at the hearing demonstrated that Defendant showed a low IQ or was mentally deficient insufficient. Defendant's counsel offered information from his former wife calling him crazy but no medical records or other reliable and authoritative evidence was introduced to support this claim.

Rather, these characterizations appear to be biased and personal. His former wife was not called to testify at the hearing. Accordingly, the Court accords these characterizations little, if any, weight. The hostility between the two was evident. Moreover, the Government submitted a psychological evaluation of Zeivald done in 2000, which found that Defendant did not have any mental illness. (Ex. Q of Pl.'s Brief Following the Evidentiary Hearing). In the evaluation, the doctor noted that "[-h]e demonstrated the capacity for sustained concentration and attention as well as the ability to articulate his thoughts and feelings." (*Id.*) Thus, the Court finds his mental capacity more than sufficiently sound to support a finding the Defendant understood and knowingly and voluntarily waived his rights.

Thus, the government has met its burden by a preponderance of evidence. Defendant understood and knowingly and voluntarily waived his Fifth Amendment rights when he spoke with

the law enforcement officials. His motion to suppress the statements he made as a result of this conversation is **DENIED**.

### D. Motions for Bill of Particulars

The Court **DENIES** the motions for a bill of particulars by both Defendant Zeivald and Defendant Naiman. A bill of particulars has three purposes: (1) to inform the defendant of the nature of the charge against him with sufficient precision to enable him to prepare for trial, (2) to avoid or minimize the danger of surprise at the time of trial, and (3) to enable him to plead his acquittal or conviction in bar of another prosecution for the same offense when the indictment itself is too vague, and indefinite for such purposes. *United States v. Ayers*, 924 F.2d 1468, 1483 (9th Cir. 1991). After the two Defendants filed these motions, the government submitted more information clarifying the nature of the charges against both Defendants. This information was more than sufficient to accomplish the goals legitimate goals sought by Defendants. Thus, the Court finds further information unnecessary. *See, e.g., United States v. Giese,* 597 F.2d 1170, 1180 (9th Cir. 1979) (finding no requirement in conspiracy to disclose all overt acts). The Court concludes that in filing the Bills of Particulars, Defendants seek information more appropriately pursued through available discovery procedures. The motion is **DENIED.**

## II. CONCLUSION

In light of the above analysis, the Court **DENIES** Defendant Weisz's Wiretap Motion and Defendant Zeivald's Motions to Suppress Statements and Evidence, but **GRANTS** Defendant Weisz's and Defendant Yeshiva Imrei Yosef' s Storage Closet Motion . Thus, evidence resulting from the unconstitutional search of the Storage Closet shall be suppressed for Defendant Weisz and Defendant Yosef. Additionally, the Court **DENIES** both Defendant Zeivald's and Naiman's Motions for Bill of Particulars.


**IT IS SO ORDERED.**

Dated this 5th day of October, 2008,

GEORGE P. SCHIAVELLI

_____

HON. GEORGE P. SCHIAVELLI

UNITED STATES DISTRICT JUDGE
